The court will proceed to the fourth case, Parker v. Colvin. Mr. Brooks May it please the court, opposing counsel, my name is Dave Brooks and I represent I'Leana Parker v. Commissioner of Social Security. This is regarding a denial of Social Security disability benefits. There are several arguments that we'll raise and I'll start with the first one is that the ALJ, when evaluating my client's case, completely ignored important medical evidence. In particular, on April 4th, 2013, a couple of months before her hearing, she had an MRI of her brain. And then a few days later, there was a CAT scan of her brain. Now, the ALJ didn't mention that evidence anywhere in the decision and that both the MRI and the CAT scan indicated that my client had MS, multiple sclerosis. The commissioner did not deny this before the district court or doesn't deny it now. The district court's treatment in the lower court decision was that the MRI and the CAT scan did not qualify as relevant evidence. That was the treatment they gave to the argument below. And I would respectfully submit that that's inconsistent with this court's finding in Goins v. Colvin, which called an MRI potentially decisive medical evidence. Before this court, the commissioner has said, indicated, no reasonable reading of the evidence provides any support that Dr. Oka diagnosed her with multiple sclerosis or demyelinating disease of any kind. I would respectfully submit that that's a material factual error. That's set forth in the reply brief, I believe quite specifically. But Dr. Oka was the person, the doctor who both administered the MRI and the CAT scan. And at the conclusion, it was mentioned that the initial indication for this is they were examining her for MS. But the conclusion was the diagnosis of multiple sclerosis on both tests. And they were diagnostic codes for 340, which is the diagnostic code that was used at that time for multiple sclerosis. So there's really no question when you carefully look at the record that indicates that my client was diagnosed by multiple sclerosis after having an MRI and a CAT scan. And that was not addressed by the district court. And the commissioner further argued that even if my client was diagnosed with MS, it's still not error because the ALJ doesn't have to address every piece of evidence. Now, I don't think that's consistent with the Goins case either, which also dealt with an MRI that was not addressed by the ALJ. The court said at that time, that case involved not MS, but Chiari formation. And in the Goins case, this court said, that's not me. And I would argue that multiple sclerosis, like Chiari formation, is not merely a runny nose or an ingrown toenail or any other inconsequential medical finding. Therefore, I think it is material evidence that should not be ignored. Now, we're just asking the court to find that, first of all, that the MRI and the CAT scan that diagnosed her with MS was in fact relevant objective evidence that the ALJ failed to consider. Dr. Oka did in fact diagnose Ms. Parker with multiple sclerosis. I know opposing counsel is going to dispute that, but that's what the report indicates. And that's after he read his own MRI and CAT scan. I don't believe it's reasonable to conclude that a diagnosis of multiple sclerosis is an inconsequential finding that ALJ is free to ignore. Now, I know the MRI and the CAT scan don't give specific functional limitations, but that's an unrealistic expectation for the MRI. The MRI and the CAT scan are objective evidence. And that objective evidence supports all of my client's testimony regarding her symptoms. And her testimony indicated that she had work-related limitations. She fulfilled all of her obligations that are required under Social Security regulations. She supplied all of her medical records, and she testified about what was wrong with her. And the objective evidence supported the findings that she listed. Furthermore, we are just asking the court to find that residual functioning capacity assessment that was made by the ALJ, that failed to consider an MRI and a CAT scan of her brain, that doesn't give serious consideration to that evidence, is not supported by the substantial evidence in this case. The second item that I would go to is the finding that the routine language that's found in so many of these decisions that my client was found not entirely credible. The commissioner alleges that the ALJ was relying on discrepancies between Ms. Parker's testimony and the evidence. Nowhere in the ALJ's decision or in their brief are those purported discrepancies set forth. The commissioner also indicated an ALJ's credibility findings need not specify which statements were not credible. That is inconsistent with several decisions of this court. I would refer the court to Spiva, Bjornsson, Allensworth, and Stage. In Spiva, it specifically talks about which statements are not credible. Bjornsson says there needs to be specific evidence that the ALJ considered in determining the claimant's complaints are not credible. Stage in particular, the most recent case that deals with credibility issues in social security cases, indicated that the purported inconsistencies must be substantial and they must be material. So the undefined purported discrepancies that are mentioned in the decision or in the commissioner's brief do not satisfy the test of any of those cases. Furthermore, Ms. Parker should have been found to be credible. In her initial interview, a social security representative indicated she was a nice lady, sad and quiet, walks slowly, looks to be in pain, and furthermore, my client had an excellent work history before she claimed to be disabled. I'm referring to both the Hill and the Cole case, but that's not a factor that can be ignored. I mean, the work history is an important factor in evaluating somebody's credibility. But my client just didn't have a regular steady work history. She had an exceptional work history. Very few people that come here on a social security case did what my client did. My client was transferring funds, sometimes over a billion dollars, in transaction and commercial loans internationally. In most weeks, she would transfer at least three transactions of more than a billion dollars a week. She did this for years, okay? She didn't stop doing this job. She stopped doing this job because they felt that they couldn't trust her to handle those responsibilities anymore. And there's no reason to call into question this very nice woman's credibility. That's just not fair to her. There are a couple other areas that have been dealt with in the brief that I'd like to bring to your attention. My client has glaucoma, primary open-angle glaucoma, which she had glaucoma surgery for 10 to 12 years ago. But she also had selective laser tuberculoplasty surgery, and if I didn't say that right, I'm doing the best I can, on both eyes, on separate occasions. The ALJ said that her glaucoma was just being treated with recommended drops. That's not accurate. Now, the commissioner in the brief acknowledges that my client had surgery just days before her hearing, but calls them laser treatments. I would respectfully submit to you laser treatment, as it's set forth in the brief, is a distortion of laser eye surgery for glaucoma. She wasn't having a mole removed. She was having specific laser surgery to reduce the pressure on her optic nerve so she wouldn't go blind. In addition, my client had carpal tunnel. There was an EMG that said that she didn't have carpal tunnel, but she'd had a previous bilateral carpal tunnel release surgery a few years before, and all the other objective evidence reflected that she did have carpal tunnel. My client also, it's not included in the RFC, but she was sent by her neurologist to physical therapy, and the physical therapist, in evaluating her, said she had bilateral weakness in her shoulders, 3 minus out of 5. Now, if you had 3 out of 5, what that means is that in your shoulder, you could move your shoulder in opposition to gravity, but any pressure about that beyond, against the force of gravity, you wouldn't be able to resist. She didn't even have that level. She was 3 minus. She was below being able to regularly move at her shoulder level against the force of gravity. Her bilateral hands and elbows, she was rated for strength of 3 out of 5. Same. She could move against gravity, but if there was any additional resistance, she wouldn't be able to do that. And her cervical spine was once again 3 minus out of 5. A lot of discussion was made about whether the proper diagnosis has been made, but her symptoms were real, and they were supported by objective evidence, and we're just asking you to consider that. Thank you very much. Thank you, Mr. Brooks. Mr. Adili. Good morning, Your Honors. May it please the Court. Chad Adili on behalf of the Commissioner. For the reasons expressed in our brief, the reasons given in our brief, we believe that opposing counsel, that appellant, has not identified any errors requiring remand. Counsel, could you speak up a little? Certainly. I apologize, Your Honor. Our position is that opposing counsel has not identified any errors requiring remand. I guess I'll address the arguments in turn as opposing counsel has raised them to the Court today. First, the April 2013 MRI and CT scan, as reflected in our brief, our view is that they are most reasonably read not to include a diagnosis of multiple sclerosis. If you look at the MRI for which Dr. Abu-Aita referred appellant to Dr. Oka, it includes multiple sclerosis in the clinical indication, but then when you look at the impression, which is the interpretation of the results of the exam, what it says is there are a few subcortical white matter hyperintensity foci that could be the result of demyelinating disease or could be something else, could be a sequela of a chronic ischemic disease in the brain. And what Dr. Oka did was recommend the CT scan with and without contrast to further examine that abnormality, what was perceived as an abnormality, when nearly two weeks later, I think it was 12 days later, on April 16th, he conducted the CT scan, it was largely normal. What he concluded was that what he had perceived as an abnormality in the MRI scan appeared to be a collection of cortical veins, that there wasn't an abnormality. And I think, as reflected in our brief, the most reasonable reading of that is that they were trying to rule out multiple sclerosis and they did, in fact, rule it out. No other doctor mentioned multiple sclerosis in the record. Opposing counsel cites Goins, but in Goins, as counsel noted, there was an impression of a Chiari malformation, which is a pretty serious malady where the brain intrudes on the spine. At that point, the court said, okay, look, this is serious enough that you can't omit discussion of this. But here we don't have an impression of multiple sclerosis. Moreover, the ALJ noted that Dr. Abu-Aita, who sent the claimant for this test, didn't recommend any follow-up treatment. And opposing counsel says in his brief, well, look, there was no time. This was done in April, the ALJ's hearing was in June, and the ALJ's decision was in August. That's well and good, but there were a couple of months, so if there had been any follow-up treatment, the evidence could have been presented to the ALJ. No such evidence was presented. And the agency currently issued an NPRM that may change this, but there's no rule that prevents the submission of that evidence currently to the appeals counsel. There's not even currently a requirement to show good cause for failure to produce it earlier. And there was, I don't know the exact dates, but there was probably at least a year between the ALJ's decision and the appeals counsel's denial of review, which would have permitted counsel below, which was not opposing counsel here, or opposing counsel, depending who was representing the claimant at that point, to augment the record with that evidence. It doesn't appear anywhere in the record. With respect to the glaucoma, the overarching problem here is that opposing counsel comes into court, asking the court to find that the ALJ improperly omitted additional limitations, without pointing to any medical opinion. What he says, what he presents is his own lay view of the evidence. So when, for example, you take SLT, we referred to in our brief as a laser treatment, it certainly is surgery. But when you read about it, it's actually not that dangerous or invasive. It selectively targets the trabecular meshwork, which is the sort of drainage function, carries out the drainage function on the anterior portion of the eye. And because it is so well targeted, it's referred to as a cold laser. It sort of operates only on the specific tissue that it's targeting. It doesn't even need to be targeted that carefully, because the only tissue that responds to it is this trabecular meshwork. So it's serious. It's the next step beyond the drops. But when opposing counsel says that the ALJ said that she was treated only with drops, that's actually a misreading of what the ALJ says. The ALJ tracked the entirety of Ms. Parker's treatment from 2011 through 2013. And initially, in 2011 and early 2012, the doctor did treat her only with drops, only late in the record used SLT. So when it's tracked as a sort of timeline narrative, saying that only drops were used is true at the beginning of the narrative. The ALJ specifically notes the surgery at the end of the narrative. But again, no doctor opined any limitation based on the glaucoma. And as we say in our brief, and this is sort of a concern, to permit the claimant who is represented by counsel before the ALJ, who has contemporaneous medical treatment. So here, in June of 2013, counsel below asked the ALJ, and the ALJ granted the request to leave the record open for two weeks to augment it. And yet, despite having contemporaneous medical care, she never asked the ALJ for an additional opinion, and she never presented one of her own, despite the fact that she knew the only medical source opinions of record were the state agency reviewers who opined in August of 2012 and October of 2012, but she had no severe impairment at all. In the listings equivalence context, which understandably is more of a binary yes-no situation, what the court has said in Buchanan is, look, if you're represented by counsel, you have contemporaneous medical care, and you don't present an opinion, we're going to assume, we're going to infer that you didn't think one would help you. So too with the wrist impairment. The ALJ noted her history of carpal tunnel release in 2008, but thought that the evidence was overwhelmed by the fact that Dr. Abu-Aita did an EMG that was completely normal, that found no electro-diagnostic evidence of any limitation, and that Dr. Siddiqui found her to have near-normal grip strength to be able to pick up a coin with both hands, despite her allegations to the contrary. And then finally, with respect to the credibility, what I would say is the court has, in multiple cases, found that a minimal articulation of a credibility finding that rests entirely on the ALJ's identification of discrepancies between a claimant's allegations and the record to be sufficient. If the claimant says, I am this disabled, and the ALJ says, well, no, I think you're this disabled because of the evidence in the record, the court's found that reasonable. I would point the court, as we cite in our brief, to Pepper, Schmidt, Jones, Sienkiewicz. But here the ALJ really significantly credited the appellant's view of her limitations. So the state agency doctor said no severe impairment at all, which would have meant no limitations at all. And the ALJ said that that was unfair. And at the end of the ALJ's decision, really sort of tied limitations to the impairments that he did find credible. He found her to be significantly credible, just not completely credible, and limited her to sedentary work, which is a very limiting residual functional capacity, and then added additional limitations, including environmental limitations based on sort of other considerations. So in our view, as expressed in our brief, we think that, again, opposing counsel hasn't identified errors requiring remand, hasn't identified any fatal defects, and therefore asked the court to affirm. Thank you. Mr. Brooks, your time has expired, but you may have two minutes. I would just ‑‑ I think I kind of mentioned it before, but I would just reiterate that it's not my client's ‑‑ I understand that my client was represented by someone else before, and, you know, I can't look back and say what they did. You know, I'm not going to do that at this point. I mean, counsel at that time may have thought that when he had an MRI and all of these things, that that was sufficient. He didn't need any more than that. That's, of course, speculation on my part. But I think it's a reasonable speculation. But apart from this, my client's duty is to tell what's wrong with her and supply all of her medical treatment, which she did. And I know that stuff could have been ‑‑ other evidence could have been submitted to the appeals counsel after the fact. That doesn't address my client's circumstances. She was without work and didn't have any access to medical treatment at that point because she had no funds because she'd been out of work at that point, probably for a couple of years. So she didn't have insurance anymore. And that's still impacting her even to now, so that it's difficult for her to get medical treatment. So it's fine to say that you can get supplemental evidence later, but if you don't have the resources to do that, then it's an unrealistic expectation. Thank you very much. Thank you, Mr. Brooks. Mr. Abelli. The case is taken under advisement.